# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
BRENDA M. WILSON,                       )
                                        )
        Plaintiff,                      )
                                        )          Civil Action No.
        v.                              )          08-40228-FDS
                                        )
MICHAEL J. ASTRUE, Commissioner,        )
Social Security Administration,         )
                                        )
        Defendant.                      )
_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
## AND PLAINTIFF'S MOTION TO REVERSE

**SAYLOR, J.**

This is an appeal of the final decision of the Commissioner of the Social Security

Administration denying an application for social security disability insurance ("SSDI") and

supplemental security income ("SSI") benefits.  Plaintiff Brenda M. Wilson appeals the denial of

her application on the grounds that the decision is not supported by substantial evidence under

42 U.S.C. §§ 405(g) and 1383(c)(3).  She disputes the administrative law judge's holding that

she is not "disabled" within the meaning of the Social Security Act, 42 U.S.C. §§ 423(c), (d),

and 1382c(a)(3)(A).

Pending before the Court is Wilson's motion to reverse the decision and the

Commissioner's motion to affirm.  For the reasons stated below, the motion to reverse will be

granted and the motion to affirm will be denied.

## I.      Background

### A.      Education and Occupational History

Plaintiff Brenda M. Wilson was born in 1960 in Brighton, Massachusetts.  (AR 26, 145).
She completed high school, and attended college for two years.  However, she did not earn a
degree.  (AR 27).

In the last fifteen years, Wilson has worked a variety of part-time and full-time jobs.  For
eleven years she operated a mobile catering truck.  She prepared food and drove the truck in the
morning; in the afternoon she stayed home to take care of her children.  (AR 34,53).  After that,
she worked in the parts department for Hoodla Oil.  At the administrative hearing, she testified
that she bought parts and helped with "repairs," but she did not say what she repaired.  (AR 35).
She then worked full-time as a furniture upholsterer.  (AR 36).  She also worked as a
convenience store manager, and (for three years) as a bartender.  (AR 32, 37).  She worked for a
year as a cook at Franklin Pierce College, but had to stop in September 2005 due to pain in her
hips and legs.  (AR 30).  Up until April 2006, she was working fifteen hours per week as a home
health aide for people with cerebral palsy.  She would perform household chores, such as
cleaning and dog walking.  She has not worked since April 2006.

### B.      Medical History

#### 1.      Physical Impairments

Wilson suffers from several medical problems.  She was diagnosed with hepatitis C in

January 2006.  (AR 195).[1]  She was treated with Pegasys/Interferon and Ribavirin.  (AR 190).[2]
Although the treatment was successful and the hepatitis is now in remission, she suffered side
effects including headaches, nausea, vomiting, and depression.  (AR 24, 190, 214).

In May 2006, genetic testing revealed that Wilson also suffers from hereditary
hemochromatosis.  (AR 197, 214).[3]  As a result, she has been treated with regular phlebotomies,
sometimes as often as once a week.  (AR 215, 253).  The phlebotomies have been successful at
controlling the hemochromatosis, but they have consistently left her fatigued.  (AR 25, 248).

Wilson also suffers from pain in her back and legs.  This pain extends from her buttocks
to her knees.  Leg cramps prevent her from sleeping well at night, and consequently she never
feels well rested during the day.  (AR 45, 46, 257).  She has described the pain in her leg joints
as typically being a five on a scale of 1 to 10.  (AR 45, 46).  She has been diagnosed with
arthralgias[4] and myalgias[5] with an elevated rheumatoid factor.  However, her doctors agree that
she most likely does not have rheumatoid arthritis.  (AR 268).  Judith Stabilius, a rheumatologist
who treated Wilson, believes these conditions are likely a result of her hepatitis C.  (AR 261).

---

[1] Hepatitis C is a form of hepatitis, which is an "inflammation of the liver" and is usually caused by a viral infection, but sometimes by "toxic agents."  Marjory Spraycar, ed., STEDMAN'S MEDICAL DICTIONARY 784-786 (26th ed. 1995).

[2] Interferon is a "class of small glycoproteins that exert antiviral activity . . . through cellular metabolic processes . . . ."  Spraycar, STEDMAN'S MEDICAL DICTIONARY at 881.  Ribavirin is a "synthetic nucleoside antiviral agent."  Id. at 1548.

[3] Hemochromatosis is a "disorder of iron metabolism characterized by excessive absorption of ingested iron, saturation of iron-binding protein, and deposition of hemosiderin in tissue, particularly in the liver, pancreas, and skin . . . ."  It may lead to cirrhosis of the liver, diabetes, bronze pigmentation of the skin, or heart failure. Spraycar, STEDMAN'S MEDICAL DICTIONARY at 776.

[4] Arthralgia is "severe pain in a joint, especially one not inflammatory in character."  Spraycar, STEDMAN'S MEDICAL DICTIONARY at 149.

[5] Myalgia is "muscular pain."  Spraycar, STEDMAN'S MEDICAL DICTIONARY at 1161.

In early 2007, Wilson continued to suffer from severe back pain.  She was not sleeping well and was unable to return to work.  While she initially believed the pain was related to her hepatitis C treatment, it persisted for several months after the treatment was concluded.  An MRI of her back conducted on May 12, 2007, revealed a mild diffuse disc bulge at the T12-L1 level. (AR 262).  The record does not indicate that any treatment was prescribed for that condition.

## 2.   Mental Impairments

On November 2, 2006, Wilson was examined by Dr. E. Arthur Garvin, a psychologist. (AR 231).  Among Wilson's "impairments of record" listed by Dr. Garvin were depression and agoraphobia.  (*Id.*).  The depression behaviors Wilson reported to Dr. Garvin included a lack of interest in going anywhere, constantly eating, sleeping only two hours a night, and lack of personal hygiene.  (AR 232).  She also reported having some memory problems, but denied being suicidal.  (*Id.*).

Garvin also screened Wilson for agoraphobia.[6]  Wilson explained that she does not like to leave her home because she believes people know she has hemochromatosis and believe they can catch it from her.  She said she avoids her relatives, including her mother, for the same reason. (*Id.*).

Garvin diagnosed Wilson with dysthymic disorder.[7]  He found that she had lower-than-average auditory memory, but that her long-term memory was intact.  He also concluded that she

---

[6] Agoraphobia is a "mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open . . . ."  Spraycar, STEDMAN'S MEDICAL DICTIONARY at 38.

[7] Dysthymia is a "chronic mood disorder manifested as depression for most of the day, more days than not . . . ."  It can be accompanied by several different symptoms, including "poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness."  Spraycar, STEDMAN'S MEDICAL DICTIONARY at 536.

was not suffering from any hallucinations or delusions and that her judgment and insight were

good.  He concluded that she was not agoraphobic, and that her inability to leave her home was

based on her medical condition, not on any agoraphobic behavior.  (*Id.*).  He concluded that she

had a score of 40 on the Global Assessment of Functioning (GAF) scale.  (AR 233).[8]  However,

he noted that this score was based mainly on restrictions due to medical problems with only a

minimum contribution from depression.  (*Id.*).

In a report dated November 2006, Celeste N. Derecho, a psychologist who examined

Wilson, concluded that she suffered from no severe mental impairments.  (AR 234).  However,

like Garvin, Derecho concluded that Wilson suffered from dysthymia.  (AR 237).

### C.    Daily Activities

In her application for SSDI and SSI, Wilson indicated that her daily activities have been

severely limited by her medical problems.  She does not sleep well, and consequently is tired all

the time.  (AR 146).  She performs a minimal amount of housework such as cleaning or laundry,

but is often unable to finish it because of fatigue.  (AR 146,147).  She is not able to do much

yard work because she becomes dizzy and is limited in the amount of time she can spend in the

sun due to her medication.  (AR 147).  She is not able to travel long distances away from her

home because she becomes dizzy.  (AR 148).  She shops for ten minutes each week.  (*Id.*).  She

sometimes prepares her own meals, but a woman brings her many of her meals.  (AR 147).  She

often needs to be reminded to eat and to maintain her personal hygiene.  (AR 146).

---

[8] The GAF Scale is used by clinicians to state their overall assessment of a patient's functioning.  The scale is divided into ten ranges of functioning between 0 and 100.  A score of 40 means the individual has "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  Marcia Stanhope & Ruth N. Knollmueller, HANDBOOK OF PUBLIC AND COMMUNITY HEALTH NURSING PRACTICE 216 (2d ed. 2001).

She describes her daily routine as taking pills, resting until the side effects of the pills wear off, eating, and then taking pills and continuing this cycle. (AR 145).

### D.     Procedural Background

Wilson applied for a SSDI and SSI benefits on May 1, 2006, alleging that she became disabled on January 25, 2006. (AR 10, 141). The regional commissioner denied her application both upon initial review and upon reconsideration. (AR 73-85). Wilson requested an administrative hearing, which was held on August 28, 2007. (AR 22, 87-89). Wilson was represented by counsel and testified at the hearing. (AR 22-51). A vocational expert, Ruth Baruch, also testified at the hearing. (AR 51-68).

The ALJ issued his decision on May 30, 2008, concluding that Wilson was not disabled. (AR 10-19). The Appeals Council denied Wilson's request for review of the ALJ's decision, thereby rendering his opinion the final decision of the Commissioner. (AR 1-3).

## II.    Analysis

### A.     Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The ALJ's factual findings "if supported by substantial evidence, shall be conclusive," 42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ. It does not fall on the reviewing Court." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *see Evangelista v. Secretary of Health & Human Servs.*, 826 F.2d 136, 143 (1st Cir. 1987). Therefore, "[j]udicial review of a Social Security Claim is limited to

determining whether the ALJ used the proper legal standards, and found facts based on the proper quantum of evidence." *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*. *Seavey*, 276 F.3d at 9.

### B.    Standard for Entitlement to SSDI and SSI Benefits

An individual is not entitled to SSDI or SSI benefits unless he or she is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1)(A), (d) (setting forth the definition of disabled in the context of SSDI); *id.* §§ 1382(a)(1), 1382c(a)(3) (same in the context of SSI). "Disability" is defined, in relevant part, as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be severe enough to prevent the plaintiff from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).[9]

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or

---

[9] "Complex regulations, administered by the Commissioner of Social Security prescribe . . . [a] protocol for making a disability decision." *Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir. 2001). "Part 404 of Title 20 regulates [SSDI], which is available to those who have paid social security taxes for the required period; Part 416 regulates [SSI], which applies if a claimant has not paid the requisite taxes. The regulations pertinent here mirror one another, so we refer only to Part [404]" going forward. *Id.* at 2 n.1.

> combination of impairments, the application is denied; 3) if the impairment meets the
> conditions for one of the 'listed impairments' in the Social Security regulations, then
> the application is granted; 4) if the applicant's 'residual functional capacity' is such
> that [s]he . . . can still perform past relevant work, then the application is denied; 5)
> if the applicant, given his or her residual functional capacity, education, work
> experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).  "The applicant has the burden of

production and proof at the first four steps of the process," and the burden shifts to the

Commissioner at step five to "com[e] forward with evidence of specific jobs in the national

economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir.

2001).  At that juncture, the ALJ assesses the claimant's RFC in combination with the

"vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. §

404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial

gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).


### C.   <u>The Administrative Law Judge's Findings</u>

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20

C.F.R. § 404.1520(a)(4).  He expressly found that Wilson had not engaged in any substantial

gainful activity since January 25, 2006, the alleged onset date of her disability.  (AR 12).

At the second step of the evaluation process, the ALJ found that Wilson suffers from a

severe combination of three impairments:  hepatitis C, hemochromatosis, and lumbar disorder.

(AR 12).  He found that these limitations resulted in limitations in her ability to "crawl, lift and

carry heavy objects, and stand and/or walk for prolonged periods of time."  Because the

limitations interfere with Wilson's ability to perform "basic work activities," they are considered

severe impairments.  (AR 13).

Although Wilson alleged disability due to depression and anxiety as well, the ALJ expressly found that the she did not have a severe mental impairment.  He noted that while Wilson reported suffering from depression, anxiety, and sleep disturbance, there was no evidence in the record of significant signs or symptoms of these disorders (AR 13).

At the next step, the ALJ determined whether any of Wilson's severe impairments met the requirements of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  He concluded that they did not.  He found that Wilson's lumbar disorder did not meet the severity requirements of Listing 1.04.  He found no evidence that Wilson was unable to "ambulate effectively," and he also found no evidence of motor loss or sensory loss.  He also found no evidence that a straight leg raise test was positive.  (AR 14).  He also found that Wilson's hepatitis C did not meet the severity requirements of Listing 5.05.  (AR 14).  Finally, he found that Wilson's hemochromatosis did not meet the requirements of the 7.00 Listing, which covers hematological disorders.  (AR 14).

The ALJ then proceeded to the fourth step in the procedure, where he determined Wilson's residual functional capacity ("RFC") and her ability to perform past relevant work.  He found that Wilson has the ability to lift 25 pounds occasionally and less than ten pounds frequently.  She can stand or walk for two hours out of an eight hour day.  She can sit for six hours out of an eight hour day, but must be given freedom to walk around or stretch for no more than a minute or two every 30 to 90 minutes to "maintain appropriate flexibility and prevent muscle spasm."  She can do the following things occasionally:  climb ladders, ramps, stairs, ropes and scaffolding; balance, kneel and crouch; reach in all directions; and use her lower extremities to push and/or pull.  (AR 14).

The ALJ found that Wilson cannot perform any of her past relevant work.  He found that all of her past jobs—personal care aide, truck driver, parts runner, bartender, furniture upholsterer, cook, store manager, and fast food worker—were on the medium or light exertional levels.  Wilson is limited to less than the full range of light exertional activities, and therefore she cannot perform any of that work.  (AR 17).

The ALJ made no finding as to whether Wilson has any transferable job skills.  Using the Medical Vocational Guidelines (the "Grid") as a framework, he determined that whether Wilson has transferable job skills was immaterial to a determination of disability.  (AR 18).  The Grid supports a finding of "not disabled" regardless of whether she has transferable job skills.  20 C.F.R. Part 404, Subpart P, Appendix 2.

Finally, at the fifth step, the ALJ considered whether there are jobs that exist in the national economy that Wilson can perform.  In making this determination, the ALJ expressly relied on interrogatories completed by Ruth Baruch, a vocational expert.  Those interrogatories included the following exchange:

> Assume an individual is the same age as the claimant (47 years of age) has the same education (2 years college) and work experience (personal care aide, cook, bartender, fast food worker, truck driver, store manager, furniture upholster, and parts runner).  Assume this individual may: lift occasionally 25 pounds; lift frequently less than 10 pounds; stand/walk a total of 2 hours in an 8 hour day; sit at least 6 hours of 8 hours but with freedom to stretch her legs and walk around for no more than a minute or two every 30-90 minutes as needed in order to maintain appropriate flexibility and prevent muscle spasm; occasionally climb ramps, stairs, ladders, ropes, scaffolding; occasionally balance, kneel and crouch; occasionally reach in all directions; and occasionally use the lower extremities to push and/or pull.  Assume further that this individual is precluded from crawling.  Identify any jobs, if any, within the restrictions contained in the forgoing hypothetical.  Identify such jobs by title, DOT number, skill level and exertional level.  Also provide national and regional numbers for each job identified and sources(s) of that data.  Finally, identify the geographic regional area you have examined.

Based on the above hypothetical claimant could perform work as follows:

- Information Clerk / DOT # 237.367.022 / Semiskilled / Sedentary Work
  25,530 employed in Massachusetts in this census group.
  1,112,350 employed in the USA in this census group.
  Geographical regional economy examined was State of Massachusetts
  within the New England region.

- Parking Lot Cashier / DOT # 211.462.010 / Unskilled / Light
  75,020 employed in Massachusetts in this census group.
  3,479,390 employed in the USA in this census group.
  Geographical regional economy examined was State of Massachusetts
  within the New England region.

- Gate Guard / DOT # 372.667.030 / Semiskilled / Light
  21,510 employed in Massachusetts in this census group.
  1,004,130 employed in the USA in this census group.
  Geographical regional economy examined was State of Massachusetts
  within the New England region.  (AR 109-110)

Accordingly, the ALJ determined that a finding of "not disabled" was appropriate.  (AR

19).

### D.    **Plaintiff's Objections**

Wilson raises two main objections to the ALJ's determination that she is not disabled.

She contends that the determination is not supported by substantial evidence because (1) the ALJ

relied on flawed advice from the vocational expert in making his determination at step five, and

(2) in assessing the severity of Wilson's claimed mental impairments, the ALJ failed to utilize

the special technique set forth in 20 C.F.R. § 404.1520a(a),(c).

Wilson objects to multiple aspects of the ALJ's step five determination, and contends that

she can only perform unskilled work.  That contention is based on the fact that the ALJ made no

finding as to whether she has any transferable job skills.  Two of the jobs the vocational expert

found that Wilson was able to perform – information clerk and gate guard – are semi-skilled.

Wilson contends that because the ALJ made no finding as to whether she had transferable job skills, there is insufficient evidence that she can perform those jobs.  Therefore, Wilson contends, those two jobs provide no support for the ALJ's finding that jobs exist in the national economy that she can perform.

The Commissioner contends that simply because the ALJ did not make a finding on transferability of skills does not mean that Wilson is automatically limited only to unskilled jobs.  In making his determination on disability, the ALJ relied on the Grid, which supports a finding of "not disabled" regardless of whether a claimant with Wilson's characteristics possesses transferable skills.  The Commissioner contends that the ALJ was entitled to rely on the Grid, and was not required to make a finding of transferability of skills.

Social Security Ruling 82-41 provides as follows:

> *When transferability of work skills is at issue*.  Transferability of skills is an issue only when an individual's impairment(s), though severe, does not meet or equal the criteria in the Listing of Impairments in Appendix 1 of the regulations but does prevent the performance of past relevant work (PRW) and that work has been determined to be skilled or semiskilled. . . . When the table rules in Appendix 2 are applicable to a case, transferability will be decisive in the conclusion of "disabled" or "not disabled" in only a relatively few instances because, even if it is determined that there are no transferable skills, a finding of "not disabled" may be based on the ability to do unskilled work.

Wilson's situation meets the criteria under SSR 82-41 for when transferability of skills is an issue.  Her impairments are severe enough to prevent her from performing past work, but they do not rise to the level of a listed impairment.

SSR 82-41 also establishes what an ALJ should do when transferability is an issue:

> When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision. . . . When a finding is made that a claimant has transferable skills, the acquired skills must be identified, and specific occupations to which the acquired

12

work skills are transferable must be cited in the State agency's determination or ALJ's decision.

The ALJ's decision lacks any discussion of Wilson's skills, let alone whether or not any of her skills are transferable.

The Commissioner contends that the ALJ was nonetheless entitled to find that Wilson could perform semi-skilled work despite making no finding on transferability of skills.  As support for his position, the Commissioner relies on the fact that the ALJ relied on the Grid in making his determination.  As previously noted, the Grid advises a ruling of "not disabled" in Wilson's case whether or not she has transferable skills.  That argument, however, mischaracterizes the stated basis for the ALJ's opinion.  The ALJ did not rely solely on the Grid; indeed, he specifically stated that he was prevented from relying solely on the Grid due to limitations contained in Wilson's RFC.  He used the Grid as a guide, but he also needed to consult a vocational expert to determine "the extent to which these limitations erode the unskilled light and sedentary occupational base . . . ."  (AR 18).  The Court therefore may not simply affirm the decision based on the ALJ's purported exclusive reliance on the Grid.

Even when an ALJ relies on the testimony of a vocational expert, he must still make findings on transferability of skills.  See *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224-1226 (9th Cir. 2009); *Draegert v. Barnhart*, 311 F.3d 468, 475-477 (2nd Cir. 2002); *Vazquez v. Sec'y of Health & Human Servs*, 683 F.2d 1, 4-5 (1st Cir. 1982); *Rivera v. Astrue*, 2010 WL 711717, 4-5 (N.D.Tex. 2010).  Such a ruling is necessary to provide this Court with a sufficient record to determine whether or not the ALJ's decision is supported by substantial evidence.

In *Bray*, the Ninth Circuit explained the rationale behind a requirement of a ruling on

transferability of skills.  There, a vocational expert testified that the claimant had transferable skills.  *Bray*, 554 F.3d at 1225.  However, the ALJ himself did not make any finding on the topic.  *Id*.  Upon review of the ALJ's decision, the district court found that "the source of evidence regarding transferable skills is apparent and reviewable by the court."  *Id*. at 1225.  The district court also concluded that "it was correct for the vocational expert to assume that Bray had some degree of computer skill."  *Id*.  The Ninth Circuit found that it was error for the district court to make such a ruling on the evidence provided by the vocational expert.  "This is precisely the sort of finding . . . that SSR 82-41 requires the ALJ, and not the court, to make.  Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ-not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking."  *Id*.

A similar concern was addressed by the First Circuit in *Vazquez*.  There, the Grid advised a finding of "not disabled" if the claimant had transferable skills, but "disabled" if the claimant had no transferable skills.  *Vazquez*, 683 F.2d at 4.  The vocational expert, meanwhile, testified that the claimant was able to perform skilled work he had not previously performed.  *Id*.  The First Circuit found that these seemed to guide the ALJ to make contradictory conclusions about whether or not Vazquez was disabled.  In reviewing the ALJ's decision, the First Circuit found it impossible to determine how the ALJ came to the conclusion that Vazquez was not disabled because the ALJ did not make a finding on transferability.  "This lack is particularly serious because the record suggests that the ALJ may well have believed that the jobs Vazquez now can perform are really "unskilled" or that, even though he does not now possess the requisite skills to perform them, he can readily learn those skills," the Court said.  *Id*.

Thus, when the ALJ is required to make a finding on transferability of skills and he does not make such a finding, the district court is left with an insufficient record on which to assess the ALJ's determination.  Here, the ALJ states that if Wilson were able to perform the full range of either sedentary or light work, the Grid would warrant a finding of "not disabled."  However, because she cannot perform a full range of work at either level, he also relied on the testimony of a vocational expert.  He then simply listed the vocational expert's answer to the hypothetical he posed to her regarding Wilson's abilities.  Finally, he stated that based on her age, education, work experience, and RFC he found that Wilson "has been capable of making a successful adjustment to other work . . . ."  (AR 18-19).  It is unclear if this decision is based solely on her ability to acquire new skills, an assumption that she has skills that will transfer to a new job, or some combination of both.  Without a ruling on transferability of skills to clarify this issue, this Court is not left with sufficient information to determine if the ALJ's ruling on Wilson's ability to perform semi-skilled work is supported by substantial evidence.

If the two semi-skilled jobs cannot be considered in this Court's review of the ALJ's step five determination, that leaves only the unskilled parking lot cashier position as evidence that Wilson can perform work that exists in the national economy.  According to the vocational expert's analysis, there are 75,020 parking lot cashier jobs in Massachusetts and 3,479,390 in the national economy.  (AR 109).  With such an abundance of parking lot cashier jobs in the national economy, Wilson could be considered not disabled even if she is able to perform only this job.  See *Edwards v. Sec'y of Health & Human Servs.*, No. 94-1345, 1994 WL 481140, at *2 (1st Cir. Sept. 2, 1994) (unpublished) (finding that 67,500 jobs in the national economy was sufficient to satisfy the Commissioner's burden of proof).  An ALJ need not identify more than one job the

claimant can perform.  20 C.F.R. § 404.1566.  However, the claimant must be able to perform the job the ALJ identifies.

Wilson contends that she cannot perform the parking lot cashier job because it requires frequent reaching and her RFC states that she can only occasionally reach in all directions. Parking lot cashier falls under the "Cashier II" category in the *Dictionary of Occupational Titles*. 1991 WL 671840.  The *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("SCO") states that Cashier II jobs require frequent reaching, which is defined as reaching "from 1/3 to 2/3 of the time."  1991 WL 671840.  The Commissioner does not contend that the Cashier II position does not require the ability to reach frequently.  However, he contends that the ALJ was entitled to rely on the expertise of the vocational expert in making the determination that Wilson can perform the job.  Furthermore, argues the Commissioner, the vocational expert can rely on publications other than the SCO, as well as his personal experience as a job placement counselor, in making the determination that the claimant can perform a specific job.

It is not contested that there is a disparity between Wilson's RFC and the physical capabilities the DOT lists as required to perform the parking lot cashier position.  The DOT contends the position requires frequent reaching, but Wilson's RFC says she can only occasionally reach.  It may be that the vocational expert believes Wilson can perform the parking lot cashier job despite this inconsistency.  An ALJ may rely on the expertise of a vocational expert in making a determination that a claimant is capable of performing a job.  However, if the ALJ's testimony is inconsistent with information in the DOT, the ALJ is required to resolve this inconsistency before relying on the testimony.  Social Security Ruling 00-04p provides:

16

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

In his decision, the ALJ did not address the apparent discrepancy between Wilson's RFC and the job description.  He stated, "Pursuant to SSR 00-04p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."  However, with regard to the parking lot cashier job, that is simply not true.  In his hypothetical interrogatory the ALJ stated that Wilson can "occasionally reach in all directions."  The DOT states that the parking lot cashier position requires the ability to frequently reach.  The ALJ was required to resolve the conflict before he relied on the vocational expert's testimony that Wilson can perform the job.  Without such a resolution, the job cannot be considered evidence that Wilson is able to perform work that exists in the national economy.

Under the circumstances, the case must be reversed and remanded to the ALJ for further proceedings consistent with this opinion.

## III.   Conclusion

For the foregoing reasons, plaintiff's motion for an order to reverse the final decision of the Commissioner of the Social Security Administration is GRANTED, and defendant's motion to affirm the action of the Commissioner is DENIED.  The matter is remanded to the Commissioner for further proceedings consistent with this opinion.

**So Ordered.**

 /s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  March 30, 2010                    United States District Judge